### Stephanie HAUGEN, Plaintiff,

v.

### Michael J. ASTRUE, Commissioner of Social Security, Defendant.

### Civil Action No. 06–G–2258–J.

United States District Court,
N.D. Alabama,
Jasper Division.

July 18, 2007.

Darryl W. Hunt, Clark & James LLC, Birmingham, AL, for Plaintiff.

Edward Q. Ragland, U.S. Attorney's Office, Birmingham, AL, Haila Naomi Kleinman, Social Security Administration–Office of General Counsel, Atlanta, GA, for Defendant.

## MEMORANDUM OPINION

GUIN, District Judge.

The plaintiff, Stephanie Haugen, brings this action pursuant to the provisions of section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final adverse decision of the Commissioner of the Social Security Administration (the Commissioner) denying her application for Social Security Benefits. Plaintiff timely pursued and exhausted her administrative remedies available before the Commissioner. Accordingly, this case is now ripe for judicial review under 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The sole function of this court is to determine whether the decision of the Commissioner is supported by substantial evidence and whether proper legal standards were applied. *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983). To that end this court "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Bloodsworth,* at 1239 (citations omitted). Substantial evidence is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth,* at 1239.

## STATUTORY AND REGULATORY FRAMEWORK

In order to qualify for disability benefits and to establish his entitlement for a period of disability, a claimant must be disabled. The Act defines disabled as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months...." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 416(i). For the purposes of establishing entitlement to disability benefits, "physical or mental impairment" is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant is disabled, Social Security regulations outline a five-step sequential process. 20

C.F.R. § 404.1520(a)-(f). The Commissioner must determine in sequence:

(1) whether the claimant is currently employed;

(2) whether she has a severe impairment;

(3) whether her impairment meets or equals one listed by the Secretary;

(4) whether the claimant can perform her past work; and

(5) whether the claimant is capable of performing any work in the national economy.

*Pope v. Shalala,* 998 F.2d 473, 477 (7th Cir.1993); *accord McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir.1986). "Once the claimant has satisfied Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have a listed impairment but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job." *Pope,* at 477; *accord Foote v. Chater,* 67 F.3d 1553, 1559 (11th Cir.1995).

 In the instant case, the ALJ, Randall C. Stout, determined the plaintiff met the first two tests, but concluded she did not suffer from a listed impairment. The ALJ found the plaintiff unable to perform her past relevant work. Once it is determined that the plaintiff cannot return to his prior work, "the burden shifts to the [Commissioner] to show other work the claimant can do." *Foote,* at 1559. When a claimant is not able to perform the full range of work at a particular exertional level, the Commissioner may not exclusively rely on the Medical–Vocational Guidelines (the grids). *Foote,* at 1558–59. The presence of a non-exertional impairments (such as pain, fatigue or mental illness) also prevents exclusive reliance on the grids. *Foote,* at 1559. In such cases "the [Commissioner] must seek expert vocational testimony". *Foote,* at 1559.

## THE STANDARD WHEN THE CLAIMANT TESTIFIES HE SUFFERS FROM DISABLING PAIN

In this circuit, "a three part 'pain standard' [is applied] when a claimant seeks to establish disability through his or her own testimony of pain or other subjective symptoms." *Foote,* at 1560.

The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* at 1560 (quoting *Holt v. Sullivan,* 921 F.2d 1221, 1223 (11th Cir.1991)). In this circuit medical evidence of pain itself, or of its intensity, is not required.

While both the regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, *neither requires objective proof of the pain itself.* Thus under both the regulations and the first (objectively identifiable condition) and third (reasonably expected to cause pain alleged) parts of the *Hand* standard *a claimant who can show that his condition could reasonably be expected to give rise to the pain he alleges has established a claim of disability and is not required to produce additional, objective proof of the pain itself.* See 20 CFR §§ 404.1529 and 416.929; *Hale* at 1011.

*Elam v. Railroad Retirement Bd.,* 921 F.2d 1210, 1215 (11th Cir.1991)(parenthetical information omitted)(emphasis added). Furthermore, it must be kept in mind that "[a] claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Foote* at

1561. Therefore, if a claimant testifies to disabling pain and satisfies the three part pain standard, he must be found disabled unless that testimony is properly discredited.

▮▮▮ When the Commissioner fails to credit a claimant's pain testimony, he must articulate reasons for that decision.

> It is established in this circuit that if the Secretary fails to articulate reasons for refusing to credit a claimant's subjective pain testimony, then the Secretary, as a matter of law, has accepted that testimony as true. Implicit in this rule is the requirement that such articulation of reasons by the Secretary be supported by substantial evidence.

*Hale v. Bowen,* 831 F.2d 1007, 1012 (11th Cir.1987). Therefore, if the ALJ either fails to articulate reasons for refusing to credit the plaintiff's pain testimony, or if his reasons are not supported by substantial evidence, the pain testimony of the plaintiff must be accepted as true.

## THE IMPACT OF A VOCATIONAL EXPERT'S TESTIMONY WHEN PAIN OR OTHER SUBJECTIVE SYMPTOMS ARE INVOLVED

▮ It is common for a vocational expert ("VE") to testify at a claimant's hearing before an ALJ, and in many cases such testimony is required. The VE is typically asked whether the claimant can perform his past relevant work or other jobs that exist in significant numbers within the national economy based upon hypothetical questions about the claimant's abilities in spite of his impairments. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Jones v. Apfel,* 190 F.3d 1224, 1229 (11th Cir.1999).

If the claimant is unable to perform his prior relevant work the burden shifts to the Commissioner to establish that he can perform other work. In such cases, if the vocational expert testimony upon which the ALJ relies is based upon a hypothetical question that does not take into account all of the claimant's impairments, the Commissioner has not met that burden, and the action should be reversed with instructions that the plaintiff be awarded the benefits claimed. This is so even if no other hypothetical question is posed to the VE. *See Gamer v. Secretary of Health and Human Services,* 815 F.2d 1275, 1280 (9th Cir.1987)(noting that when the burden is on the Commissioner to show the claimant can do other work, the claimant is not obligated to pose hypothetical questions in order to prevail). However, it is desirable for the VE to be asked whether the claimant can perform any jobs if his subjective testimony is credited. Such a hypothetical question would allow disability claims to be expedited in cases in which the ALJ's refusal to credit the plaintiff's pain testimony is found not to be supported by substantial evidence.

In *Varney v. Secretary of Health and Human Services,* 859 F.2d 1396 (9th Cir. 1988), the Ninth Circuit adopted the Eleventh Circuit rule which holds that if the articulated reasons for rejecting the plaintiff's pain testimony are not supported by substantial evidence, that testimony is accepted as true as a matter of law. *Id.* at 1401. The court noted that "[a]mong the most persuasive arguments supporting the rule is the need to expedite disability claims." *Id.* If the VE is asked whether the claimant could perform other jobs if his testimony of pain or other subjective symptoms is accepted as true, the case might be in a posture that would avoid the necessity of a remand. As *Varney* recognized, if the VE testifies the claimant can perform no jobs if his pain testimony is accepted as true, the only relevant issue would be whether that testimony was properly discredited. *Id.*

## THE STANDARD FOR REJECTING THE TESTIMONY OF A TREATING PHYSICIAN

 As the Sixth Circuit has noted: "It is firmly established that the medical opinion of a treating physician must be accorded greater weight than those of physicians employed by the government to defend against a disability claim." *Hall v. Bowen*, 837 F.2d 272, 276 (6th Cir.1988). "The testimony of a treating physician must ordinarily be given substantial or considerable weight unless good cause is shown to the contrary." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *accord Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991). In addition, the Commissioner "must specify what weight is given to a treating physician's opinion and any reason for giving it no weight...." *MacGregor*, 786 F.2d at 1053. If the Commissioner ignores or fails to properly refute a treating physician's testimony, as a matter of law that testimony must be accepted as true. *MacGregor*, 786 F.2d at 1053; *Elam*, 921 F.2d at 1216. The Commissioner's reasons for refusing to credit a claimant's treating physician must be supported by substantial evidence. *See MacGregor*, 786 F.2d at 1054; *cf. Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir.1987)(articulation of reasons for not crediting a claimant's subjective pain testimony must be supported by substantial evidence).

## DISCUSSION

In the present case, the plaintiff alleges she is unable to work primarily because of chronic severe neck pain.[1] The plaintiff began to complain about increasing neck pain in early 2003. The plaintiff's primary care physician, Dr. Sparacino, treated the plaintiff for complaints of hand and neck pain on numerous occasions. On March 24, 2003, the plaintiff complained of hand and foot trouble. Dr. Sparacino increased the plaintiff's prescription for Celebrex and ordered an x-ray. [R 169] The x-ray showed "osteoarthritic changes at the carpal first metacarpal joint space." [R 167] On April 7, 2003, the plaintiff came in complaining that her hands were "really hurting" even after having her Celebrex prescription doubled. [R 164] She also complained of "having neck pain [with] radiating numbness [and] tingling into the [right] arm for several months". [R 164] Dr. Sparacino injected the first metacarpal joint with Lidocaine and Dep–Medrol. [R 164] Dr. Sparacino's treatment plan included testing for rheumatoid arthritis and an MRI scan because of cervical radiculopathy.[2] [R 164] After reviewing the MRI, Dr. Sparacino referred the plaintiff to Dr. Hash, a neurosurgeon. [R 163] On April 21, 2003, Dr. Sparacino prescribed Lortab 5 mg. [R 162]

The MRI scan was performed April 8, 2003. It showed a "[p]osterior central disc herniation with marginal osteophyte[3] formation" at C4–5 causing "cord compression with focal myelomalacia.[4]" [R 163] At

---

1. The plaintiff also alleges that her ability to work is adversely impacted by depression and also obesity prior to her successful gastric bypass surgery. Because the plaintiff is disabled based only upon her cervical spine problems, the court will not elaborate on these alleged impairments except to note that there is significant evidence to support the plaintiff's allegations as to these impairments. It is also clear from the record that the ALJ failed to properly assess their vocational impact.

2. Radiculopathy means disease of the nerve roots. *Dorland's Illustrated Medical Dictionary* 1404 (28th Edition).

3. Osteophytes are abnormal boney outgrowths. *Dorland's Illustrated Medical Dictionary* 1200 (27th Edition).

4. Myelomalacia is a "morbid softening of the spinal cord." *Dorland's Illustrated Medical Dictionary* 1090 (28th Edition).

this level the MRI also showed "[s]evere left and moderate to severe right froaminal stenosis."[5] [R 163] At C5–6 the MRI showed "[b]road-based posterior disc herniation with cord compression and severe foraminal stenosis." [R 163] At C6–7 the MRI showed "a[p]osterior central disc herniation with cord compression." [R 163] In addition to the MRI, an EMG nerve conduction study on April 25, 2003, indicated "left C6 radiculopathy." [R 112]

On April 21, 2003, the plaintiff's treating neurosurgeon, Dr. Hash noted the MRI showed "severe cord compression at 4–5, 5–6 and 6–7." [R 136] Dr. Hash opined that neck surgery would be "fraught with risks" due to her extreme obesity and very short neck.[6] [R 163] Therefore, he recommended cervical traction and physical therapy in order to avoid surgery if possible. [R 136] Dr. Hash wrote a letter to the plaintiff's primary care physician stating that she was "better as far as her neck and left arm pain [was] concerned" following therapy and traction. [R 129] However, he warned that if she had "any type of neck injury she would be prone to paralysis of her arms and possibly her legs." [R 129]

On April 24, 2003, the plaintiff complained to Dr. Sparacino of shoulder pain radiating into the collar bone and down into the back. [R 162] On June 4, 2003, Dr. Sparacino discussed carpal tunnel surgery with the plaintiff and she was to use braces. [R 161] On October 30, 2003, Dr. Sparacino prescribed Lorcet Plus. [R 159]

The plaintiff was scheduled to have gastric bypass surgery in December 2003. [R 156] However, the surgery was not done because of her cervical spine disease. [R 156, 230, 320] She asked Dr. Sparacino to refer her to another neurosurgeon for a second opinion. [R 156]

On January 22, 2004, Dr. Matz, a neurosurgeon at the Kirklin Neurosurgery Clinic, examined the plaintiff. His examination found mild hyperreflexia, which Dr. Matz found to be "indicative of early myelopathy."[7] [R 230] Dr. Matz had concerns about the plaintiff's treatment in view of her obesity:

> Because of her weight, she would not be a candidate for prone surgery or certainly would be far from ideal. Ventral surgery would require three level discectomy, which also sometimes impairs healing to try to fuse over three levels. Originally, she was going to try to have some weigh reduction [surgery]. However, she reports as she was going into surgery, the anesthesiologist would not intubate her because of cervical stenosis. This is a difficult situation because on the one hand, it would be ideal to treat her obesity first prior to embarking on any cervical surgery. In contrast, it would be better according to her anesthesiologist to treat her cervical stenosis prior to embarking on general anesthesia for obesity surgery. In any event,

---

5. A foramen is a natural opening or passage especially one into or through a bone. *Dorland's Illustrated Medical Dictionary* 648 (28th Edition). "Foraminal stenosis is tightening of the openings of the exit points for each nerve as it is exiting the spinal column." *Surgical Management of Spinal Stenosis*, (Richard J. Bransford, M.D., ed.) viewed at: http://www.orthop. washington .edu/uw/laminectomy/tabID—3347/ItemID—283/ PageID—2/Articles/Default.aspx

6. Dr. Hash listed the plaintiff's weight as 275 pounds and her height as 5′ 4″. [R 135]

7. Myelopathy includes any of various functional disturbances or pathological changes in the spinal cord, often referring to nonspecific lesions in contrast to the inflammatory lesions of myelitis. *Dorland's Illustrated Medical Dictionary* 1090 (28th Ed.1994).

for the most part, I offered her an option of a three-level discectomy. However, I really would like to see if she gets better with traction because if she does, I would not perform any cervical surgery and have her decide on the obesity surgery with the idea of a fiberoptic intubation.

[R 230–31]

On April, 15, 2004, Dr. Sparacino again prescribed Lorcet Plus. The Commissioner's consultant, Dr. Gill, examined the plaintiff on May 24, 2004. [R 191–193] The plaintiff reported to Dr. Gill that her primary problem was neck pain, which she said had become worse. [R 191] The plaintiff told Dr. Gill that she had "constant severe pain in the neck and constant dull headaches." [R 191] She told Dr. Gill the pain radiated into each arm intermittently, with intermittent numbness and tingling in both hands and arms. [R 191–92] Dr. Gill noted the plaintiff walked slowly. [R 192] The plaintiff complained of "tenderness to palpation over the cervical spine." [R 192] Dr. Gill noted that "[s]he moves it slowly and complains of pain with movement." [R 192] Dr. Gill Diagnosed chronic neck pain, cervical degenerative disc disease, bilateral knee pain, probable degenerative joint disease, and morbid

obesity. [R 193] Dr. Gill did not give any opinion as to how these conditions would impact the plaintiff's ability to do work related activities.

On June 30, 2004, the plaintiff underwent gastric bypass surgery. [R 239] This surgery was successful.[8] On September 23, 2004, the plaintiff reported to Dr. Sparacino that she was having hip pain that "started when she tried walking for exercise." [R 259] On November 16, 2004, Dr. Sparacino prescribed Lorcet Plus.

The plaintiff returned to Dr. Hash on December 20, 2004, complaining of neck pain radiating into her right arm and numbness in her hands. [R 225] On examination, there was a positive Spurling's test[9] to the right. [R 225] Her right triceps reflex was absent, and biceps reflexes were absent bilaterally. [R 225] An x-ray showed degenerative changes in the cervical spine, and Dr. Hash ordered a myelogram. The myelogram showed "severe cervical spondylosis"[10] with "multi level loss of intravertebral disc space as well as anterior osteophyte and posterior osteophyte formation." [R 224] A CT scan was also done and showed "severe canal narrowing at multiple levels most severely at C4–5, C5–6 and C6–7. . . ." [R 223] This was "secondary to ossification[11] of the posterior longitudinal ligament as well as unconvertebral hypertrophy."[12] [R 223]

8. When she was examined on April 20, 2005, her weight was 176 pounds. [R 229]

9. "A 'foraminal compression test of Spurling' is done to diagnose radiculopathy. For this test, you will bend your head forward and to the sides while the health care provider provides slight downward pressure to the top of the head. Increased pain or numbness during this test is usually indicative of cervical radiculopathy." see the "Herniated nucleus pulposus (slipped disk)" article from "MedlinePlus Medical Encyclopedia" at http://www.nlm.nih.gov/medlineplus/ency/article/000442.htm.

10. Cervical spondylosis is defined as "degenerative joint disease affecting the cervical vertebrae, intervertebral disks, and surrounding

ligaments and connective tissue, sometimes with pain or paresthesia radiating down the arms as a result of pressure on the nerve roots." Dorland's Illustrated Medical Dictionary 1567 (27th Edition).

11. Ossification is "the formation of bone or of a bony substance; the conversion of fibrous tissue or of cartilage into bone or a bony substance." Dorland's Illustrated Medical Dictionary 1198 (28th Edition).

12. The unconvertebral joints are "small synovial joints formed secondarily between the lateral lips (uncinate processes) of the superior surfaces of the bodies of the lower cervical vertebrae and the inferior surface of the superior vertebral body." http://www.medilexicon.com/medicaldictionary.php?t=46472

Dr. Hash completed a long term disability claim form after his examination on December 20, 2004. On that form, Dr. Hash indicated the plaintiff had cervical radiculopathy, with neck pain going down her right arm. [R 232] Dr. Hash indicated the plaintiff's symptoms first appeared in February 2003. [R 232] Dr. Hash indicated that he had placed the plaintiff on "off work status" May 19, 2003. [R 233] Dr. Hash further indicated the plaintiff had not been released to work and that he never anticipated releasing her to work. [R 233]

After reviewing the myelogram, Dr. Hash ordered an MRI. [R 221] The MRI was done on February 14, 2005, and showed:

1. Mild central spinal canal stenosis at C3–4.

2. Large central to left paracentral disc herniation at C4–5, contacting and deforming the spinal cord and severely narrowing the spinal canal. Moderate bilateral foraminal stenosis is also identified at this level.

3. Concentric disc bulge and 2 separate superimposed disc herniations at C5–6 as described above, severely compromising the spinal canal and deformity [of] the spinal cord. The lateral foramina are severely narrowed bilaterally at this level.

4. Broad central disc herniation at C6–7, contacting and deforming the spinal cord centrally. Lateral foramina are moderately narrowed bilaterally at this level.

5. Signal abnormality consistent with myelopathy is visible at the levels of spinal cord compression and deformity from C4–5 through 6–7.

[R 220]

An MRI of the lumbar spine was also done in February 2005. It showed:

1. Central to right paracentral disc herniation at L5–S1. Mild unilateral right foraminal stenosis is also noted at this level.

2. Left lateral disc herniation at L4–5.

3. Small central disc herniation at L3–4. Mild unilateral left foraminal stenosis is also identified at this level.

[R 218]

On March 14, 2005, Dr. Hash recommended surgery: "I would recommend an anterior cervical diskectomy and fusion at C4–5, C5–6 and C6–7. I told her this is a very high-risk surgery." [R 217] As in 2003, Dr. Hash told the plaintiff that "if she did not have surgery and should she have a neck injury she could end up with a spinal cord injury." [R 217] Dr. Hash encouraged the plaintiff to proceed with the surgery. [R 217]

The plaintiff also saw Dr. Matz, her other treating neurosurgeon. On April 20, 2005, Dr. Matz's review of systems noted "weakness in the hands and slow loss of coordination." [R 229] On physical examination, Dr. Matz found "hyperreflexia throughout with bilateral Hoffman's sign,[13] slightly slowed fine motor scale with some mild patchy hypesthesia [14] in the hands."

---

Hypertrophy is "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." *Dorland's Illustrated Medical Dictionary* 802 (28th Edition).

13. "Hoffman's sign is a neurological sign in the hand which is an indicator of problems in the spinal cord. It is associated with a loss of grip. The test for Hoffman's sign involves tapping the nail on the third or forth finger. A positive Hoffman's is the involuntary flexing

of the end of the thumb and index finger-normally, there should be no reflex response. Hoffman's sign is an indicator of a number of neurological conditions including Cervical Spondylitis, other forms of spinal cord compression...." *See,* http://www.mult-sclerosis.org/Hoffmanssign.html

14. Hypesthesia or hypoesthesia is an "abnormally decreased sensitivity to stimulation." *Dorland's Illustrated Medical Dictionary* 804 (27th Edition).

[R 229] Dr. Matz's diagnostic assessment included:

> Her hard copies of an MRIs [sic] are not available today, but her most recent MRI shows C4–C5, C5–C6, and C6–C7 disk displacement and compression of spinal cord with mild C3–C4 disk disease. Patient being a candidate for a three-level anterior cervical discectomy, arthrodesis, and fixation to decompress her cervical spinal cord and reconstruct it as well. She does have cervical instability. . . . . The immediate benefit would be to protect the spinal cord, the long-term benefit would be to arrest the myelopathy and hopefully improve her function. The material risks include esophageal perforation, stroke, wound infection, hardware failure, and injury of the spinal cord, which is frank and I was very clear about that with her.

[R 229]

Dr. Sparacino again prescribed Lorcet Plus in June 2005 and the plaintiff reported having no insurance. [R 253] On October 26, 2005, Dr. Sparacino noted the plaintiff would be tried on a new drug for neuropathic pain. [R 250]

 In spite of overwhelming medical evidence to the contrary, ALJ Stout found the plaintiff did not meet the Eleventh Circuit pain standard because "[t]here is no objective clinical evidence of any condition(s), singly or in combination, that could reasonably result in the level of numbness in her feet and hands, headaches, neck pain, back pain, poor concentration, depression or other symptoms that the claimant alleges prevent her from working." [R 14] This finding by ALJ Stout is among the most egregious misapplications of the Eleventh Circuit pain standard by an ALJ in the more than 1,000 social security appeals the undersigned has decided.

The plaintiff has multiple herniated cervical and lumbar discs confirmed by myelogram and MRI scans. One of her treating neurosurgeons Dr. Hash, interpreted the April 2003 MRI as showing "severe cord compression" at three levels. An EMG nerve conduction study indicated cervical radiculopathy. A second treating neurosurgeon, Dr. Matz, found indications of early myelopathy in January 2004 based upon his physical examination. In December 2004, Dr. Hash found a positive Spurling's test, indicating radiculopathy. According to Dr. Hash, a CT scan and myelogram in January 2005 showed "severe canal narrowing at multiple levels." An MRI scan in February 2005 confirmed that the plaintiff had severe narrowing of the spinal canal causing deformity of the spinal cord. An MRI of the lumbar spine at this time showed multiple herniated discs. Following the plaintiff's successful gastric bypass surgery, both of the plaintiff's treating neurosurgeons recommended cervical surgery.

In light of the medical evidence, ALJ Stout's finding that the plaintiff did not meet the Eleventh Circuit pain standard is absurd. The unfairness of his decision is manifested by his description of the April 2003 MRI: "[A]n MRI of the cervical spine showed spondylosis at C4–5, C5–6, and C6–7." [R 15] There is no mention of the herniated discs or the spinal cord compression described as severe by the plaintiff's treating neurosurgeon. ALJ Stout's summarization of the February 2005 MRI is no better: "Dr. Matz reviewed her MRI from February 2005 which showed C4–5, C5–6 and C6–7 disc displacement and mild C3–4 disc disease." [R 16] Again, ALJ Stout did not mention that the MRI showed severe compromise and deformation of the spinal cord. [R 220] ALJ Stout in fact misquoted Dr Matz, who interpreted the MRI as showing "disk displacement and compression of [the] spinal cord." [R 229]

ALJ Stout's finding that the plaintiff did not meet the Eleventh Circuit pain standard is erroneous and has no support in the medical evidence of record. There is no substantial evidence in the record to support a finding that the plaintiff did not meet the Eleventh Circuit pain standard. Even though ALJ found the plaintiff did not meet the pain standard, he did in fact make a determination that the plaintiff's pain allegations were not credible. Therefore, the court will apply the Eleventh Circuit's pain standard and consider whether the ALJ's recitation of reasons is supported by substantial evidence.

At the hearing the plaintiff was asked about whether she could perform sedentary jobs:

ALJ: In your own words, what would prevent you from doing say if you were sitting on some kind of assembly—you know, maybe you were assembling something that was either in front of you or it's coming down a conveyer belt or something, what would prevent you from, you know, reaching out, handling, putting stuff in slots or picking stuff up or inspecting stuff?

CLMT: The numbness and pain in my arms.

ALJ: Okay.

CLMT: Doing repetitive motion. Like I said, drying my hair is a real major accomplishment.

ALJ: Okay.

CLMT: You know, and it's the simplest of things. It's—all I know is that it hurts. It—like—

ALJ: Would you—

CLMT:—said, my—

ALJ: Would you be able to pick up let's say—you know, let's just say if you had to inspect pencils. Let's say pens is [sic] coming down the lines and you are picking them up just to be sure they had ink in them or something,

you know, and you had to pick one up and put it down, pick one up and put it down, reach, pick one up. Would you be able to do that for eight hours a day if they gave you a 15–minute break in the morning and 15–minute break in the afternoon—

CLMT: No.

ALJ:—half an hour for lunch?

CLMT: No.

ALJ: Why? I mean, would your hands hold up? Would you [sic] arms hold up? Could—

CLMT: I doubt it.

ALJ:—you handle it?

CLMT: I doubt it. Well, for one thing, I have numbness in my hands and they say that it's nerve damage—

ALJ: Okay.

CLMT:—from the neck.

ALJ: But is the numbness bad enough where you can't, say, pick up the pencils or the toy cars or, you know, something? Could you do that?

CLMT: Not for eight hours. I couldn't—I have one spot in my back—and I don't know that I have a lot of pain. It's a numb spot and it burns like it's on fire. It hurts like it's—somebody poking a knife in it.

ALJ: Okay.

CLMT: And I don't know, I guess it's nerve damage. I'm not sure.

[R 321–324] Later in the hearing, the plaintiff was again questioned about her ability to use her arms and hands in a work setting and the impact such activities would have on her level of pain:

ATTY: ... Any type movement with your hands or shoulders or any type of reaching, does that, you know, increase your pain level?

CLMT: Yes.

ATTY: Now, you testified a little earlier your pain is a seven or a eight.

CLMT: Right.

ATTY: Does that affect any concentration that you—does that affect your ability to concentrate?

CLMT: Pain? Yes, it does.

ATTY: Do you—does the pain level ever get to the point that you just cry? Do you ever get so bad you cry?

CLMT: Um-hum.

ATTY: How—well, you [sic] got to say yes or no.

CLMT: Yes. I'm sorry. Yes.

ATTY: ... How often does this occur as far as on a daily type basis? Let's say you get up and try to sweep your floor. What does that do to you?

CLMT: I can't sweep a whole floor without stopping. I mean, it hurts.

[R 325]

The vocational expert (VE) was questioned about the vocational impact of an inability to reach and grasp:

ALJ: If the Claimant's ability to reach, handle, grasp, finger and otherwise use her upper extremities was so limited that she was only able to use her upper extremities for occasional reaching, handling, grasping and fingering and so forth, would that effect [sic] his [sic] jobs and would it affect the wide world of sedentary unskilled work?

VE: Yes, sir, it would. That—there would not be a significant number of jobs at the light or sedentary level which would only occasional [sic] require grasping and handling.

[R 331]

When asked about the vocational impact of pain:

ATTY: [I]f someone such as her has a pain level seven or above sometimes throughout the day, I am assuming that would preclude those jobs, also. Would it not?

VE: Yes, sir, that would.

[R 331]

Therefore, based upon the testimony of the VE, the plaintiff would be unable to work if she was only able to occasionally grasp and handle with her upper extremities, which was consistent with her testimony. Likewise, if the plaintiff's testimony about the level and frequency of her pain is credited, she would be unable to work.

■ As discussed above, event though ALJ Stout found the plaintiff did not meet the pain standard, he in fact considered whether she was credible. The following is ALJ Stout's credibility discussion:

In April 2004, the claimant completed a Daily Activities Questionnaire and reported that she prepared meals, shopped for personal needs, and did laundry and light cleaning. She went out of her home two or three times a week. In her spare time, she watched television for two hours at a time and read the newspaper. She visits with her family and friends and talks with them on a daily basis. She also took care of her dog and bird. The claimant also reported that she did not have problems with her concentration, but had pain in her neck and arms which prevented her from working. (Exhibit 4E). The level of activities reported is also consistent with the activities reported to Dr. Gill during the examination in May 2004. The level of activities that the claimant reported are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations.

[R 14] On the Daily Activities Questionnaire referred to by the ALJ, the plaintiff reported she does "very little cleaning" on an average day. [R 77] She also reported

doing "laundry, very light cleaning, [and] some cooking." [R 78] However, when asked to describe problems in these areas, the plaintiff wrote: "I sometimes have a problem cooking if I need to lift a pot or a skillet. Pain in my neck [and] arms cause[s] problems cleaning [and] taking care of my house." [R 80] Therefore, even the Daily Activities Questionnaire relied upon by ALJ Stout to discredit the plaintiff's testimony shows that the plaintiff's daily activities were greatly limited by her cervical disc problems.

The ability to perform the limited activities noted by the ALJ does not rule out the presence of disabling pain. The ability to watch television, do occasional shopping, or perform other sporadic activities does not mean the plaintiff is not disabled. In this circuit it has been recognized that "participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability. *Lewis v. Callahan,* 125 F.3d 1436, 1441 (11th Cir.1997). As has been noted:

> [S]tatutory disability does not mean that a claimant must be a quadriplegic or an amputee. Similarly, shopping for the necessities of life is not a negation of disability and even two sporadic occurrences such as hunting might indicate merely that the claimant was partially functional on two days. *Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity.* ... It is well established that sporadic or transitory activity does not disprove disability.

*Smith v. Califano,* 637 F.2d 968, 971–72 (3rd Cir.1981)(emphasis added). It is the ability to engage in gainful employment that is the key, not whether a plaintiff can perform minor household chores or drive short distances. In *Easter v. Bowen,* the court observed as follows:

Moreover, an applicant need not be completely bedridden or unable to perform any household chores to be considered disabled. *See Yawitz v. Weinberger,* 498 F.2d 956, 960 (8th Cir.1974). What counts is the ability to perform as required on a daily basis in the "sometimes competitive and stressful" environment of the working world. *Douglas v. Bowen,* 836 F.2d 392, 396 (8th Cir.1987) (quoting *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)).

867 F.2d 1128, 1130 (8th Cir.1989). The *Easter* court further noted that "[e]mployers are concerned with substantial capacity, psychological stability, and steady attendance...." 867 F.2d at 1130 (quoting *Rhines v. Harris,* 634 F.2d 1076, 1079 (8th Cir.1980)).

With this standard in mind, it is clear that the ALJ's articulated reasons for rejecting the plaintiff's testimony are not supported by substantial evidence. Therefore, the ALJ failed to satisfy the requirements of *Hale.* The conclusion of that court is equally appropriate in the instant case. "[T]he Secretary has articulated reasons for refusing to credit the claimant's pain testimony, but none of these reasons is supported by substantial evidence. It follows, therefore, that claimant's pain testimony has been accepted as true." *Hale,* at 1012.

## CONCLUSION

The record does not contain substantial evidence to support the ALJ's finding that the plaintiff does not meet the pain standard. In fact, the medical evidence overwhelmingly demonstrates the pain standard has been met. The magnitude of uncontradicted objective medical evidence supporting a finding that the pain standard has been met is so great that no fair and reasonable person could conclude otherwise. The reasons recited by the ALJ for

refusing to credit the plaintiff's testimony about the extent of her pain and her ability to use her upper extremities for reaching and grasping are not supported by substantial evidence. Under the law of this circuit, that testimony must be accepted as true. Based upon the plaintiff's testimony and the testimony of the VE, the plaintiff is unable to work. Therefore, the Commissioner failed to carry his burden at step five of showing the plaintiff could perform other work. Accordingly, the plaintiff is disabled within the meaning of the Social Security Act. An appropriate order remanding the action with instructions that the plaintiff be awarded the benefits claimed will be entered contemporaneously herewith.

DONE and ORDERED.

### *FINAL ORDER*

In conformity with and pursuant to the memorandum opinion entered contemporaneously herewith, it is

ORDERED, ADJUDGED and DECREED that the decision of the Commissioner of the Social Security Administration is hereby REVERSED, and the case is REMANDED to the Commissioner with instructions that the plaintiff be awarded the benefits claimed. It is

FURTHER ORDERED that the Commissioner withhold from payments that are determined to be due the plaintiff under this order an amount not to exceed 25 percent of the total amount of disability benefits to which the plaintiff is entitled, pursuant to the provisions of 42 U.S.C. § 406(b). The Commissioner is directed to advise the court of the amount withheld so that the matter may be set for final determination of the amount of attorney's fee to be allowed plaintiff's counsel for services rendered in representing plaintiff in this cause.

It is further ORDERED pursuant to Rule 54(d)(2)(B) of the Federal Rules of Civil Procedure, that plaintiff's attorney is hereby granted an extension of time in which to file a petition for authorization of attorney's fees under 42 U.S.C. § 406(b) until thirty (30) days subsequent to the receipt of a notice of award of benefits from the Social Security Administration. *This order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act.*

DONE and ORDERED.